TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00231-CV






Rooms With a View, Inc., a Texas Corporation, National Association of


the Remodeling Industry-Houston Chapter, Inc., Appellants


v.



Private National Mortgage Association, Inc., d/b/a Pennie Mae, Appellee





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 98-09772, HONORABLE PETE LOWRY, JUDGE PRESIDING





 Rooms With A View, Inc. (Rooms), a home remodeler, sued appellee Private
National Mortgage Association, Inc., d/b/a Pennie Mae (Pennie Mae) for declaratory relief, and
the National Association of the Remodeling Industry-Houston Chapter, Inc. (NARI) intervened. 
Rooms and Pennie Mae filed motions for summary judgment; NARI filed a brief in support of
Rooms' motion. The trial court denied Rooms' motion and granted final summary judgment in
favor of Pennie Mae. Rooms and NARI (collectively Rooms) filed this appeal. We will overrule
Rooms' issues on appeal and affirm the trial court's grant of summary judgment.


Background


 In November 1997, Texas voters approved Proposition 8, which amended Article
XVI, Section 50 of the Texas Constitution to allow homeowners voluntarily to encumber their
homesteads with liens in exchange for extensions of credit, i.e., "home equity loans." (1) 
Proposition 8 also amended the constitution's provisions for imposing contractors' or mechanics'
liens. 

 In 1998, Charles and Rebecca Barnett contacted Rooms about adding a glass-enclosed patio cover to their home. The Barnetts filled out a loan application with Pennie Mae
on July 30, 1998, and on July 31, Pennie Mae indicated it would approve the loan. On August
12, twelve days after the Barnetts completed the loan application, they signed a contract for
Rooms to install the patio cover for $8,085. The contract was signed at the offices of All
American Title Services, a title abstractor that Rooms and the Barnetts believed to be a "title
company" under the meaning of Proposition 8. On August 19, Pennie Mae declined to close the
loan on the grounds that All American Title Services was an abstract office, not a title company
as required by Proposition 8. Rooms sued Pennie Mae, seeking a declaration that Proposition 8
was unconstitutional. 


Summary Judgment Standard of Review

 Summary judgment is properly granted only when a movant establishes there are
no genuine issues of material fact to be decided and that it is entitled to judgment as a matter of
law. See Tex. R. Civ. P. 166a(c); Memorial Med. Ctr. v. Howard, 975 S.W.2d 691, 692 (Tex.
App.--Austin 1998, pet. denied). In reviewing the grant of summary judgment, we view the
evidence in the light most favorable to the non-movant and make every reasonable inference and
resolve all doubts in favor of the non-movant. See Nixon v. Mr. Property Management Co., 690
S.W.2d 546, 548-49 (Tex. 1985); Howard, 975 S.W.2d at 693. When the trial court's order
granting summary judgment does not specify the grounds relied upon, we will affirm the judgment
if it is supported by any of the grounds put forth by the movant. See Bradley v. State ex rel.
White, 990 S.W.2d 245, 247 (Tex. 1999); Howard, 957 S.W.2d at 693. When the trial court
grants one party's motion for summary judgment and denies the other, we review both motions,
and if we find the trial court erred, we will reverse and render the judgment the trial court should
have rendered. See Bradley, 990 S.W.2d at 247; Howard, 957 S.W.2d at 693.

 In reviewing both motions and all accompanying summary-judgment evidence, we
will view the evidence and resolve all doubts in favor of Rooms. We will overturn the trial
court's judgment in favor of Pennie Mae only if it is unsupported by any of the grounds put forth
in its motion. See Bradley, 990 S.W.2d at 247; Howard, 957 S.W.2d at 693.


Discussion

I. Unconstitutionally vague

 Rooms argues that the term "title company" in Proposition 8 is unconstitutionally
vague in governing where home improvement contracts must be executed. We disagree.

 In interpreting a constitutional provision, we start with the text of the provision. 
See Republican Party of Texas v. Dietz, 940 S.W.2d 86, 89 (Tex. 1997); Mellon Serv. Co. v.
Touche Ross & Co., 946 S.W.2d 862, 867 (Tex. App.--Houston [14th Dist.] 1997, no writ). We
use the same guidelines in interpreting constitutional provisions as we do in interpreting statutes. 
See Stine v. State, 908 S.W.2d 429, 431 (Tex. Crim. App. 1995); Mellon Serv. Co., 946 S.W.2d
at 867. If the literal text is unclear or could lead to an absurd result, we may look outside of the
language for aid in interpretation. See Mellon Serv. Co., 946 S.W.2d at 867. We consider the
purpose of the provision, the intent of the provision's drafters, and the context in which it was
written, including the legislature's practical interpretation and construction of the ambiguous term. 
See Dietz, 940 S.W.2d at 89; Mellon Serv. Co., 946 S.W.2d at 867. We may also consider
dictionary definitions, earlier court opinions, and interpretations of similar provisions from other
jurisdictions. See Dietz, 940 S.W.2d at 89; Mellon Serv. Co., 946 S.W.2d at 867-68.

 We begin with the presumption that the legislature acted constitutionally in enacting
the provision. See United States v. National Dairy Prod. Corp., 372 U.S. 29, 32 (1963);
Travelers Indem. Co. v. Fuller, 892 S.W.2d 848, 850 (Tex. 1995). The party challenging a
statute or constitutional provision bears the burden of establishing its unconstitutionality. See
Travelers Indem. Co., 892 S.W.2d at 850.

 A statute is unconstitutionally vague if it (1) does not give fair notice of what
conduct may be punished, and (2) invites arbitrary and discriminatory enforcement by its lack of
guidance for those charged with its enforcement. See Hoffman Estates v. Flipside, Hoffman
Estates, Inc., 455 U.S. 489, 498 (1982); Commission for Lawyer Discipline v. Benton, 980
S.W.2d 425, 437 (Tex. 1998). A statute is not automatically void for vagueness simply because
it is difficult to determine whether certain "marginal" acts fall within its language. See
Pennington v. Singleton, 606 S.W.2d 682, 689 (Tex. 1980). Nor is there a constitutional
requirement that a statute define all words or terms used. See Garay v. State, 940 S.W.2d 211,
219 (Tex. App.--Houston [1st Dist.] 1997, pet. ref'd). Courts recognize the myriad of factual
situations that may arise and allow statutes to be worded with flexibility, provided the public has
fair notice of what is required or prohibited. See Pennington, 606 S.W.2d at 689. In the case
of civil or regulatory statutes, no more than a reasonable degree of certainty is required. See id. 

 Applying these principles, we reject Rooms' claim that the absence of a definition
of "title company" renders Proposition 8 void for vagueness. (2) Instead, we seek to dispel any
uncertainty by defining "title company" as used in Proposition 8.

 Texas case law makes frequent use of the term "title company," but does not
clearly distinguish between "title company" and "title insurance company." (3) A "title company"
may be an agent for a title insurance company and may solicit insurance, collect premiums, issue
policies, and perform other related services, such as title searches and surveys. See Cameron
County Sav. Ass'n v. Stewart Title Guar. Co., 819 S.W.2d 600, 602 (Tex. App.--Corpus Christi
1991, writ ref'd n.r.e.). (4)

 Courts and the insurance industry also use "title company" interchangeably with
"title insurance company." See, e.g., J.H. Lacy v. Ticor Title Ins. Co., 794 S.W.2d 781, 783
(Tex. App.--Dallas 1990, writ denied); Jupe v. City of Schertz, 604 S.W.2d 405, 406 (Tex. Civ.
App.--San Antonio 1980, writ ref'd n.r.e.); Appleman § 5205, at 26 ("When a title company
insures the owner's title to property," it insures the title and assumes liability for title defects)
(emphasis added). (5)

 While "title company" and "title insurance company" are interchangeable, courts
generally distinguish them from companies doing only title abstractions. See, e.g., Martinka v.
Commonwealth Land Title Ins. Co., 836 S.W.2d 773, 777 (Tex. App.--Houston [1st Dist.] 1992,
writ denied); Stewart Title Guar. Co. v. Cheatham, 764 S.W.2d 315, 319 (Tex. App.--Texarkana
1988, writ denied). An abstractor compiles data, allowing an examiner to evaluate the title's legal
status. See Tamburine v. Center Sav. Ass'n, 583 S.W.2d 942, 947 (Tex. Civ. App.--Tyler 1979,
writ ref'd n.r.e.). A title insurer guarantees the title's status and insures owners against possible
title defects. See Martinka, 836 S.W.2d at 777.

 A company calling itself an abstract company may go beyond performing title
abstractions by also acting as an agent for a title insurer, issuing policies or doing other related
activities. See, e.g., Stewart Title Guar. Co. v. City Nat'l Bank, 796 S.W.2d 308, 310 (Tex.
App.--Eastland 1990, no writ); Lathen v. Richey, 772 S.W.2d 249, 252 (Tex. App.--Dallas 1989,
writ denied). (6)

 We note that while Proposition 8's legislative history does not discuss the meaning
of "title company," the legislative history for Committee Substitute for House Bill 740 ("CSHB
740"), titled "An Act Relating to Mechanics', Contractors', and Materialmen's Liens; Providing
Penalties," provides some insight. See Act of May 19, 1997, 75th Leg., R.S., ch. 526, 1997
Tex. Gen. Laws 1880. Although CSHB 740 did not concern home equity loans, it concerned
mechanics' liens, an issue related to those addressed by Proposition 8, and it passed during the
same legislative session as Proposition 8 in the spring of 1997. The Committee of Business and
Industry's report on CSHB 740 says, "[A] party acquiring an interest in the property (a purchaser
or lender) or a party insuring title to the property (a title company) may rely on the filing of the
bond and notice with regard to the release of the lien." House Comm. on Bus. & Indus., Bill
Analysis, Tex. C.S.H.B. 740, 75th Leg., R.S. (1997) (emphasis added). We recognize this report
did not address Proposition 8; nevertheless, we think it useful in gleaning the legislature's
intended meaning of "title company," a term used in both pieces of legislation enacted during the
same session and relating to liens against homesteads. Nothing suggests the legislature intended
"title company" to refer to an entity performing only title abstractions. 

 We hold that "title company" as used in Proposition 8 and amended Section 50
means a title insurer or an agent of a title insurer. We overrule Rooms' argument that Proposition
8 is void for vagueness.


II. Right to travel

 Rooms argues that Proposition 8 violates the constitutional right to travel granted
to citizens of the United States, or rather, a corollary right not to travel. We disagree.

 Citizens of the United States have the right to travel to and live in any state for
lawful purposes. See U.S. Const. art. IV, § 2, amend. V and XIV; Saenz v. Roe, 119 S. Ct.
1518, 1525 (1999); Owens Corning v. Carter, 997 S.W.2d 560, 579 (Tex. 1999). This right
consists of three elements--the right to enter and leave a state, the right "to be treated as a welcome
visitor rather than an unfriendly alien" when in a state of which one is not a citizen, and the right,
if one decides to move to and take up residence in another state, to be treated as any other citizen
of that state. See Saenz, 119 S. Ct. at 1525; Owens Corning, 997 S.W.2d at 579. Rooms
recognizes Proposition 8 does not impact any of these elements, and instead argues the right to
travel gives rise to a corollary "right to remain home." Rooms does not cite any authority in
support of the right not to travel but states that requiring homeowners to travel away from their
homes violates this right. Rooms further argues Proposition 8 unconstitutionally bars homeowners
from traveling to locations of their choosing, namely, contractors' offices. We disagree with both
claims. 

 We are unable to find any case law or commentary to support this alleged right not
to travel. Citizens are required to travel outside of their homes to specified locations for many
legal reasons, such as renewing a driver's license or obtaining a marriage license, as well as to
meet many day-to-day needs. We recognize that, in this age of on-line shopping, chat rooms, and
in-home exercise equipment, it is often possible to satisfy many basic (and not-so-basic) desires
without leaving the comfort of one's home. However, we are reluctant to declare that citizens of
Texas have a constitutional right to have any and all comforts, necessities, or transactions made
available to them within their homes or at locations of their choosing. Proposition 8, by requiring
contractors and homeowners to sign contracts in locations other than their homes, does not violate
any constitutional rights. (7) 

 Nor is it up to this Court to decide as Rooms urges that the legislature was overly
paternalistic in imposing this protection. Texas courts have long held that homestead rights in
Texas are "founded upon principles of the soundest policy." Inwood N. Homeowners' Ass'n v. 
Harris, 736 S.W.2d 632, 634-35 (Tex. 1987) (citing Franklin v. Coffee, 18 Tex. 413, 415
(1857)). Homestead rights are intended to protect Texas families from destitution and
homelessness and encourage feelings of "independence which are so essential to the maintenance
of free institutions." Harris, 736 S.W.2d at 634-35. Courts should liberally construe homestead
provisions in a manner that promotes that intended purpose. See Harris, 736 S.W.2d at 634-35;
Sanchez v. Telles, 960 S.W.2d 762, 769 (Tex. App.--El Paso 1997, pet. denied). The legislature
apparently believed it worthwhile to require that homestead liens be transacted away from the
homestead, perhaps to lessen the danger of undue influence or duress, or to prevent an
unscrupulous salesman from persuading a homeowner to impose such a lien without a full
understanding of all the implications. We will not second-guess that decision.

 We hold Proposition 8 and Section 50 of the constitution as amended do not violate
the First Amendment right to travel, and we overrule Rooms' argument.

III. Federal preemption and interference with interstate commerce

 Rooms argues Proposition 8 violates the Commerce Clause (8) because it interferes
with interstate commerce. It further claims Proposition 8 is preempted by federal law in the
following ways: (9) (1) the twelve-day waiting period imposed is nonsensical; (10) (2) the twelve-day
waiting period and three-day cancellation period conflict with andare preempted by the Truth In
Lending Act ("TILA"); (11) and (3) the provision requiring that both spouses sign a home
improvement contract violates the Equal Credit Opportunity Act ("ECOA"). (12) We disagree.


A. Preemption standard of review

 There is a presumption against federal preemption of state actions. See Cipollone
v. Liggett Group, Inc., 505 U.S. 504, 516 (1992); Moore v. Brunswick Bowling & Billiards
Corp., 889 S.W.2d 246, 249 (Tex. 1994). In the absence of express federal command, a state
statute is preempted only when federal law so thoroughly occupies the subject field as to indicate
Congress left no room for further state action or when a federal law actually conflicts with the
state statute. See Cipollone, 505 U.S. at 516; Moore, 889 S.W.2d at 248-49. If a federal statute
contains an express preemption clause, we look to the language of that clause to determine
Congress's intent with respect to the states' authority to legislate on related matters. See
Cipollone, 505 U.S. at 517. We will not hold that federal law preempts a state statute unless the
subject matter leaves no other conclusion or it is clear that Congress so intended. See Florida
Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 (1963).


B. Interference with interstate commerce

 Under the Commerce Clause, Congress has the power to regulate interstate
commerce. See U.S. Const. art. I, § 8, cl. 3. However, in the absence of conflicting federal
legislation, states retain broad power to regulate matters of local concern. See Great Atl. & Pac.
Tea Co. v. Cottrell, 424 U.S. 366, 371 (1976). A state may enact legislation that impacts but does
not impose clearly excessive burdens on commerce if the statute is evenhanded, does not
discriminate against interstate commerce, and safeguards an obvious local interest, and if the local
interest outweighs any national interest in avoiding the restriction. See id. at 371-72. Rooms
asserts Proposition 8 interferes with interstate commerce but does not specify any federal
legislation that conflicts with its provisions. Any slight or incidental impact Proposition 8 may
have on interstate commerce is far from excessive. We overrule Rooms' argument that
Proposition 8 interferes with interstate commerce.


C. Truth In Lending Act (TILA)

 Rooms argues federal law preempts state law because the three-day cancellation
period required by Proposition 8 conflicts with section 1635 of TILA, which provides that a
consumer-obligor to a consumer credit transaction involving a security interest in the obligor's
homestead has three days after completing the transaction to rescind it without penalty. See 15
U.S.C.A. § 1635(a), (b) (West 1998). Rooms argues Proposition 8 "overlays a second three-day
right to cancel." The three-day period granted by Proposition 8 runs concurrently with TILA's
cancellation period, and does not conflict with it. We overrule Rooms' argument as it relates to
the cancellation period.

 Rooms also argues the twelve-day waiting period conflicts with the three-day
cancellation period of section 1635 of TILA. We disagree. TILA contains a preemption clause,
section 1610, titled "Effect on other laws," which states section 1632(c) and sections 1637(c), (d),
(e), and (f) supersede state laws relating to the disclosure of credit application information that is
subject to sections 1637(c) or 1637(d). See 15 U.S.C.A. § 1610(e) (West 1998). Other than
those specified preemptions, TILA does not "annul, alter, or affect in any manner" related state
laws, unless those laws are inconsistent with TILA's provisions, and then only as far as the
inconsistency. See id. § 1610(a), (b), (d). This makes it clear that Congress, in enacting TILA,
did not intend to preempt every state law that addresses a related subject, but only those in direct
conflict with TILA. The twelve-day waiting period does not directly conflict with TILA and is
not preempted. We overrule Rooms' argument.


D. Equal Credit Opportunity Act (ECOA)

 ECOA makes it unlawful for a creditor to discriminate against an applicant for
credit on the basis of race, color, religion, national origin, sex, age, or marital status. See 15
U.S.C.A. § 1691(a)(1) (West 1998). Rooms mistakenly argues that Proposition 8's requirement
that both spouses sign a home improvement contract to create a valid mechanics' lien against the
homestead constitutes discrimination on the basis of marital status. However, section 1691d(a)
specifically states that "[a] request for the signature of both parties to a marriage for the purpose
of creating a valid lien [or] passing clear title . . . shall not constitute discrimination under this
subchapter: Provided, however, That this provision shall not be construed to permit a creditor
to take sex or marital status into account in connection with the evaluation of creditworthiness of
any applicant." Id. § 1691d(a). 

 Homestead rights in Texas are intended to protect citizens from losing their homes
and to foster home ownership and independence; statutes relating to homestead rights are to be
liberally construed to protect homesteads. See Harris, 736 S.W.2d at 634-35. Each spouse in
a marriage has a separate and undivided possessory interest in their homestead property. See Tex.
Const. art. XVI, § 50; United States v. Rodgers, 461 U.S. 677, 685 (1983). Homestead rights
vest in both spouses regardless of whether the property is owned by both spouses, by one spouse
separately, or even by a third party. See Rodgers, 461 U.S. at 685; Farmers' & Mechanics' Trust
Co. v. Perry, 56 S.W.2d 501, 502 (Tex. Civ. App.--Amarillo 1933, writ ref'd). It has long been
the rule in Texas that a lien against a homestead is invalid unless agreed to by both spouses,
except in very limited situations. See Uvalde Rock Asphalt Co. v. Hightower, 166 S.W.2d 681,
683 (Tex. Comm'n App. 1942, judgm't adopted). 

 Proposition 8's requirement that both spouses sign the home improvement contract
ensures the creditor can create a valid lien against the homestead; a lien consented to by only one
spouse would fail, and the creditor would be left without recourse against the homestead. See id. 
This requirement does not discriminate on the basis of marital status under ECOA because it has
no bearing on the creditworthiness of either spouse but simply ensures the creditor receives an
actionable lien against the homestead in exchange for the extension of credit. See Evans v.
Centralfed Mortgage Co., 815 F.2d 348, 349-50 (5th Cir. 1987). Requiring both spouses'
signatures does not conflict with ECOA, nor is it specifically preempted by section 1610. We
overrule Rooms' issue on appeal.


IV. Insufficient ballot language

 Rooms contends Proposition 8 is unconstitutional because the language used to
describe it on the November 1997 ballot did not describe proposed changes to the constitution's
provisions governing mechanics' liens. We disagree and will overrule Rooms' contentions. (13)

 To amend the Texas Constitution, three steps must occur: (1) the proposed
amendment must be approved by two-thirds of the legislature; (2) the ballot language and a brief
explanation of the proposed amendment must be published in designated newspapers and posted
at each county courthouse; and (3) the proposed amendment must be submitted to and approved
by the voters by including its ballot language on the election ballot. See Tex. Const. art. XVII,
§ 1; Tex. Elec. Code Ann. § 274.001(b) (West 1986). A proposed amendment's ballot language
is constitutionally sufficient if it identifies the amendment, showing its character and scope, that
is, its intent, import, subject matter, or theme. See Tex. Elec. Code Ann. § 274.001(b);
Whiteside v. Brown, 214 S.W.2d 844, 851 (Tex. Civ. App.--Austin 1948, writ dism'd). It is not
necessary to include all relevant details or to print the entire proposed amendment on the ballot. 
See Hardy v. Hannah, 849 S.W.2d 355, 358 (Tex. App.--Austin 1992, writ denied). Instead,
voters are presumed to be familiar with the proposed amendment's actual content before entering
the voting booth, and the ballot language need only give "fair notice to the voter of average
intelligence by directing him to the amendment so that he can discern its identity and distinguish
it from other propositions on the ballot." Id. 

 The 1997 ballot language describing Proposition 8 read as follows: "The
amendment to the Texas Constitution expanding the types of liens for home equity loans that a
lender, with the homeowner's consent, may place against a homestead." No other proposed
constitutional amendments on the ballot concerned home equity loans or homestead liens. The
major change proposed was the allowance of home equity loans against homestead property;
minor changes need not have been included on the ballot. See id. at 358; see also Caption for
Enrolled Version of H.J.R. 31 ("A joint resolution proposing a constitutional amendment
permitting an encumbrance against homestead property for certain extensions of equity credit."). 
We presume the voters knew of the changes proposed to the method of imposing a mechanics'
lien. See Hardy, 849 S.W.2d at 358. The language used to describe Proposition 8 on the ballot
fairly expressed its scope and character and set it apart from other propositions. See id. We
overrule Rooms' issue on appeal. 

Conclusion

 Having overruled all of Rooms' issues on appeal, we affirm the summary judgment
in favor of Pennie Mae.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B.A. Smith and Yeakel

Affirmed

Filed: December 9, 1999

Publish

1.   In relevant part, Proposition 8 amended Section 50 of the constitution to read as follows:


Sec. 50: (a) The homestead of a family, or of a single adult person, shall be, and is
hereby protected from forced sale, for the payment of all debts except for:


(1) the purchase money . . .;

(2) the taxes due thereon;

(3) an owelty of partition imposed against the entirety of the property . . .;

(4) the refinance of a lien against a homestead . . .;

(5) work and material used in constructing new improvements thereon, if contracted
for in writing, or work and material used to repair or renovate existing
improvements thereon if:


 (A) the work and material are contracted for in writing, with the consent of both
spouses . . . in the same manner as is required in making a sale and
conveyance of the homestead;

 (B) the contract for the work and material is not executed by the owner or the
owner's spouse before the 12th day after the owner makes written
application for any extension of credit for the work and material . . .;

 (C) the contract for the work and material expressly provides that the owner
may rescind the contract without penalty or charge within three days after
the execution of the contract by all parties . . .; and

 (D) the contract for the work and material is executed by the owner and the
owner's spouse only at the office of a third-party lender making an extension
of credit for the work and material, an attorney at law, or a title company;


(6) an extension of credit that:


 (A) is secured by a voluntary lien on the homestead created under a written
agreement with the consent of each owner and each owner's spouse; . . . or


(7) a reverse mortgage.


Tex. Const. art. XVI, § 50(a) (emphasis added); see also Tex. H.J. Res. 31, 75th Leg., R.S.,
1997 Gen. Laws 6739 (text of proposed amendment as passed by legislature).
2. Rooms argues "title company" can be construed in at least three ways, to mean companies
providing title insurance, title abstracts, or even auto or boat titles. W
e think it obvious that the
legislature did not intend title company in this context to refer to companies providing title for
automobiles, sea craft, or other items of non-real property.
3. Under the Texas Insurance Code, a title insurance company is a company performing the
business of insuring title to real property. See Tex. Ins. Code Ann. art. 9.01(c) (West 1981 &
Supp. 1999). A title insurance agent (1) owns, participates in the joint operation of, or leases and
controls an abstract plant, and (2) is authorized by a title insurance company to sell insurance,
collect premiums, and issue policies. See id. art. 9.01(f) (West 1981). A "direct operation" is
a title insurance company that owns, leases and operates, or jointly operates an abstract plant
itself, rather than using an agent. See id. art. 9.01(q), art. 9.36A (West. Supp. 1999). Black's
Law Dictionary defines a title company as a "[c]ompany that examines real estate titles and,
commonly, issues title insurance." Blacks Law Dictionary 1487 (6th ed. 1990). A title guaranty
company is a business that searches title to see if "any defects or encumbrances are recorded and
which gives the buyer of the property or the mortgagee a guaranty of the title." Id. Abstract of
title is a "condensed history of the title to land, consisting of a synopsis or summary of the
material or operative portion of all the conveyances, of whatever kind or nature, which in any
manner affect said land, or any estate or interest therein, together with a statement of all liens,
charges, or liabilities to which the same may be subject, and of which it is in any way material
for purchasers to be apprised." Id. at 10.
4. See also 9 John Alan Appleman and Jean Appleman, Insurance Law & Practice § 5201, at
15 (rev. ed. 1981) ("often title insurance companies do not receive the entire fee arising from a
real property transaction. In instances where they maintain the histories of title transfers in that
area, usually they make the entire title search as well as issuing a policy asserting merchantability
of the title . . . . In some states, moreover, there may be title companies, or "agents," as the title
insurer terms them, which may assume the entire responsibility, and which pay only a small fee
. . . for issuance of the policy."). 
5. Other states also use "title company" to refer to either the title insurer itself or the insurer's
agent. See, e.g., Greenberg v. Stewart Title Guar. Co., 492 N.W.2d 147,152 (Wis. 1992) (both
title insurer and its agents referred to as title company and held not liable for title defects unless
they assumed responsibility for searching title); Shotwell v. Transamerica Title Ins. Co., 558 P.2d
1359, 1361 (Wash. Ct. App. 1976) (title insurance company called both title company and title
insurance company); J.H. Trisdale, Inc. v. Shasta County Title Co., 304 P.2d 832, 834 (Cal. Ct.
App. 1956) (title insurer's agent referred to as title company).
6. We have been unable to find a case in which a true abstract company, doing only title
abstraction and not acting as an insurer's agent, was referred to as a title company.
7. Rooms lacks standing to raise complaints on behalf of bedridden home owners required to
leave their homes to sign home improvement contracts.
8. U.S. Const. art. I, § 8, cl. 3.
9. Rooms' brief simply asserts that Proposition 8 is preempted because "the field has already
been occupied by Congress, utilizing its power to regulate commerce" without explaining by
which federal law. NARI's brief references TILA and ECOA. 
10. Rooms claims the waiting period is nonsensical as applied to home owners who do not want
to take out a home improvement loan with a third-party lender. However, the constitution
provides the waiting period between the signing of the contract and "application for any extension
of credit for the work and material." Tex. Const. art XVI, § 50 (emphasis added). If a home
owner does not seek any extension of credit, a mechanic's lien is unnecessary. Obtaining a
mechanic's lien implies the contractor itself is extending credit to the home owner, even if the
home owner does not apply for a third-party loan. If the contractor does not extend credit in the
form of billing the home owner as work is completed, and instead the home owner pays for the
improvements up front, there is no need to obtain a lien against the property. When a contractor
extends credit, section 50 requires that the home owner completes some form of credit application
with the contractor and then waits twelve days to sign the contract. 
11. 15 U.S.C.A. §§ 1601-1667e (West 1998).
12. 15 U.S.C.A. §§ 1691-1691f (West 1998).
13. Rooms did not bring an election contest under section 233.014 of the Election Code, which
provides that "[a]ny question relating to the validity or outcome of a constitutional amendment
election may be raised in an election contest. A contest is the exclusive method for adjudicating
such questions." Tex. Elec. Code Ann. § 233.014(g) (West 1986). Such a contest must be raised
by filing a petition before the completion of the final official canvass. See id. § 233.014(b). 
Because Rooms did not file a contestant's petition, as far as the evidence indicates, it should have
no standing to attack the validity of the ballot language. However, Pennie Mae has not raised this
issue in its briefings before this Court or the trial court below.


s title insurance." Blacks Law Dictionary 1487 (6th ed. 1990). A title guaranty
company is a business that searches title to see if "any defects or encumbrances are recorded and
which gives the buyer of the property or the mortgagee a guaranty of the title." Id. Abstract of
title is a "condensed